JOHNS–MANVILLE CORPORATION, and Manville Service Corporation, Plaintiffs,

v.

GUARDIAN INDUSTRIES CORP., Vaugh Chenoweth, Duane Faulkner, Kenneth Limburg, Robert Nishwitz, Steven Sanford and James Schairer, Defendants.

Civ. A. No. 81 70248.

United States District Court, E.D. Michigan, S.D.

May 29, 1987.

Ernie L. Brooks, Southfield, Mich., for plaintiffs.

Edward M. Kronk, Mark R. Lezotte, Detroit, Mich., Geoffrey R. Myers, Potomac, Md., for defendants.

## MEMORANDUM OPINION AND ORDER

PHILIP PRATT, Chief Judge.

### 1. INTRODUCTION

This is a patent infringement action which was filed on January 23, 1981. The non-jury trial began on October 19, 1981, consuming 34 days of trial and producing 4,143 pages of transcript and 283 exhibits. Final arguments were heard on June 10, 1982. On December 15, 1983 this court issued an opinion finding the plaintiff's patent to be valid, that the defendants had infringed, and enjoining the defendants from any further infringement. *Johns-Manville v. Guardian Industries*, 586 F.Supp. 1034 (E.D.Mich.1983), *modified*, 223 U.S.P.Q. 974. The Federal Circuit affirmed this judgment on April 24, 1985. 770 F.2d 178 (Fed.Cir.1985).

Pursuant to stipulation of the parties, the liability and damages issues were bifurcated, with the 1983 judgment dealing only with liability. The parties are still in the accounting phase. In November of 1985, the plaintiff amended its complaint, alleging that the defendants were now using a modified version of its adjudicated infringing machinery, which also infringed on the patent. On June 23, 1986, the plaintiff moved to enjoin the defendants from continuing to use this modified process. At a status conference called to discuss this matter, the defendants revealed that they planned to file motions to reopen the 1983 judgment and amend their answer to the amended complaint. These motions were filed, and are the subject of this opinion. The gravamen of the motion to reopen the 1983 judgment is that the defendants have discovered new evidence, including evidence of fraud on the part of the plaintiff, which calls the validity of the patent in suit into question. The motion to amend seeks to insert essentially the same allegations into the defendants' answer to the plaintiff's amended complaint by challenging the validity of the patent-in-suit.

### 2. STANDARD OF REVIEW

The first issues faced by the court are by what authority can it alter the 1983 judgment and what standard should be applied in doing so. The defendants argue that the 1983 judgment was interlocutory, and that the court should exercise its inherent power to modify such judgments. Plaintiff counters that the judgment was final, and

thus any motion to alter must be brought under Fed.R.Civ.P. 60(b), which contains a one year statute of limitations. Thus, the plaintiff argues, the defendants' motion to reopen is untimely.

■ Fed.R.Civ.P. 60(b) provides that: On motion and upon such terms as are just, the court may relieve a party or his legal representative from a final judgment, order, or proceeding for the following reasons: (1) mistake, inadvertence, surprise or excusable neglect; (2) newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(b); (3) fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation, or other misconduct of an adverse party; ... or (b) any other reason justifying relief from the operation of the judgment. The motion shall be made within a reasonable time, and for reasons (1), (2), and (3) not more than one year after the judgment....

Rule 60(b) applies only to final judgments, not interlocutory orders. 7 *Moore's Federal Practice*, ¶ 60.20, p. 170. A final judgment or order is one that conclusively determines the rights of the parties, leaving nothing for the court to do but execute the order. *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 467, 98 S.Ct. 2454, 2457, 57 L.Ed.2d 351 (1978). Ordinarily, in a bifurcated trial, the judgment on liability remains interlocutory, and subject to the trial court's modification during the remedial stage of the litigation. *See, e.g., Segar v. Smith*, 738 F.2d 1249, 1285 (D.C.Cir.1984), *cert. denied*, 471 U.S. 1115, 105 S.Ct. 2357, 86 L.Ed.2d 258 (1985). Thus on its face, this court's 1983 judgment was interlocutory, and not subject to the strictures of Rule 60(b).

The plaintiff argues that the affirmance by the Federal Circuit, along with the statutory grant of jurisdiction to the Federal Circuit, dictate the conclusion that the judgment was final. Appeals to the Federal Circuit are governed by 28 U.S.C. § 1292(c), which provides for:

(2) ... an appeal from a judgment in a civil action for patent infringement which would otherwise be appealable to the United States Court for the Federal Circuit and is final except for an accounting.

The Federal Circuit, in rebuffing an appellee's attempt to have an appeal from a liability judgment dismissed as being interlocutory stated:

In the present appeal, no additional proceedings are contemplated by the district court, other than an accounting. All substantive issues have been fully adjudicated and there is no question respecting the finality of the judgment as to liability; all substantive issues have been resolved.

*H.A. Jones, Inc. v. KSM Fastening Systems*, 745 F.2d 630, 632 (Fed.Cir.1984). Plaintiff argues that this case stands for the proposition that liability judgments in patent cases are final. One district court has taken the position advocated by the plaintiff, *Valmont Industries, Inc. v. Yuma Manufacturing Co.*, 50 F.R.D. 408 (D.Colo.1970), *aff'd*. 446 F.2d 1193 (10th Cir.1971), while another has held such judgments to be interlocutory. *Paper Coverting Machine Co., Inc. v. FMC Corp.*, 179 U.S.P.Q. 78 (E.D.Wisc.1973).

The Supreme Court has held that liability judgments in patent cases are interlocutory.

Although the interlocutory decision of the Court of Claims was appealable [cites omitted], as are interlocutory orders of district courts in suits to enjoin infringement [cites omitted], the decision was not final until the conclusion of the accounting [cites omitted]. Hence the court did not lack the power at any time prior to entry of its final judgment at the close of the accounting to reconsider any portion of its decision and reopen any part of the case.

*Marconi Wireless Co. v. U.S.*, 320 U.S. 1, 47, 63 S.Ct. 1393, 1414, 87 L.Ed. 1731 (1942). The fact that a liability judgment may be appealed pursuant to 28 U.S.C. § 1292(c)(2) does not alter its interlocutory character.

Section 129 of the Judicial Code was amended in 1927 to provide that "when in any suit in equity for the infringement of letters patent for inventions, a decree is rendered, which is final except for the ordering of an accounting, an appeal may be taken from such decree to the circuit court of appeals." 44 Stat. 1261, 28 U.S.C. § 227. The object of this amendment was to ensure that parties could take appeals in patent cases without being compelled to await a final accounting. *McCullough v. Kammerer Corp.*, 331 U.S. 96, 98, 67 S.Ct. 1165, 1166, 91 L.Ed.2d 1365 (1946). *McCullough* cites the House Committee on Patents report, which states:

> Under present procedure appeals may be taken from the *interlocutory decree* upholding the patent but not until a full accounting has been made to the court. Under this bill such appeal can be taken from such *interlocutory decrees* ... so as to obviate the cost of an accounting in the event the case is reversed on appeal. H.R.Rep. No. 1890, 69th Cong.2d Sess. 1 (1927) [emphasis added].

*McCullough*, 331 U.S. at 98 n. 1, 67 S.Ct. at 1167 n. 1. Several circuits have relied on *McCullough* to treat appellate jurisdiction over patent liability judgments as a statutory exception to the rule that interlocutory judgments cannot be appealed. *W.L. Gore & Assoc., Inc. v. Carlisle Corp.*, 529 F.2d 614 (3rd Cir.1976); *Ransburg Electro-Coating Corp. v. Ionic Electro Corp.*, 431 F.2d 947 (4th Cir.1970); *Illinois Tool Works, Inc. v. Brunsing*, 378 F.2d 234 (9th Cir.1967); *Ronel Corp. v. Anchor Lock of Florida, Inc.*, 312 F.2d 207 (5th Cir.1963); *Anno.* 41 A.L.R.Fed. 959. The various amendments to this section, including the most recent one, Pub.L. 97–164, Title I, § 125(a)(3), Apr. 2, 1982, 96 Stat. 36, which is codified at 28 U.S.C. § 1292(c)(2), have preserved the controlling language of the original 1927 amendment almost unchanged. Accordingly, the court's 1983 liability judgment was interlocutory and the defendant's motion to reopen is not controlled by Rule 60(b). While this conclusion saves the defendant's motion from being time-barred, it does not effect the standard of review to be employed by the court.

Issues decided at an earlier stage of the litigation, either explicitly or by necessary inference from the disposition of the issues, constitute the law of the case. *Kori Corp. v. Wilco Marsh Buggies & Draglines*, 761 F.2d 649, 657 (Fed.Cir. 1985), *cert. denied* 474 U.S. 902, 106 S.Ct. 230, 88 L.Ed.2d 229 (1985). This rule ordinarily precludes a court from re-examining an issue previously decided by itself or a higher court. *Moore v. Jas. H. Mathews & Co.*, 682 F.2d 830 (9th Cir.1982). The doctrine is that:

> [A]s a matter of sound judicial practice, under which a court generally adheres to a decision in a prior appeal in the case unless one of three "exceptional circumstances" exists: "the evidence on a subsequent trial was substantially different, controlling authority has since made a contrary decision of the law applicable to such issues, or the decision was clearly erroneous and would work a manifest injustice." [cite omitted]

*Central Soya Co. v. George A. Hormel & Company*, 723 F.2d 1573, 1580 (Fed.Cir. 1983). Where a party seeks to obtain reopening of an issue already decided by the trial court and affirmed by the court of appeals on the ground of newly discovered evidence or fraud, leave of the appellate court is not necessary to alter the earlier judgment. *Standard Oil Co. of Cal. v. United States*, 429 U.S. 17, 97 S.Ct. 31, 50 L.Ed.2d 21 (1976); *Sellers v. General Motors Corp.*, 735 F.2d 68 (3d Cir.1984).

Where a party seeks to avoid the doctrine by reopening factual issues based upon new evidence, it is appropriate for the court to apply the standards of Rule 60(b)(2), notwithstanding that rule's inapplicability to interlocutory judgments. *Smith Intern. v. Hughes Tool Co.*, 759 F.2d 1572, 1579 (Fed.Cir.1985), *cert. denied* 474 U.S. 827, 106 S.Ct. 87, 88 L.Ed.2d 71 (1985). The court must be satisfied that the evidence:

1. is in fact newly discovered;

2. could not with due diligence have been discovered earlier;

3. is not merely cumulative or impeaching;

4. is material to the issues;

5. is such that upon retrial, it would probably produce a different result.

*Gemveto Jewelry Co. v. Jeff Cooper, Inc.*, 613 F.Supp. 1052, 1058 (S.D.N.Y.1985), *vacated on other grounds*, 800 F.2d 256 (Fed. Cir.1986). In applying this standard, the court is mindful of the spirit of finality which is implicit in all judgments, and that it should be cautious in exercising its discretion to reopen proceedings based on newly discovered evidence. A mere suspicion of error will not suffice, and the court must be "convinced to a certainty" that error warranting review exists. *Perkin-Elmer Corp. v. Computervision*, 732 F.2d 888, 901 (Fed.Cir.1984), *cert. denied* 469 U.S. 857, 105 S.Ct. 187, 83 L.Ed.2d 120 (1984).

3. FACTS

At issue in this litigation are methods of producing fiberglass insulation. At the heart of the plaintiff's patent is a process for directly centrifuging thin glass fibers and cutting them into short segments (known as "staple fibers") which eliminated the need for an energy intensive process known as hot gas blast attenuation. There are two major production steps involved: 1) the formation of the small diameter fibers and 2) the breaking off of those strands into staple fibers using jets of air from an air ring. In 1983, this court found that 1) the plaintiff could claim any process which directly centrifuges small diameter fibers so long as it does not use hot gas blast attenuation after extrusion and 2) that the air ring used by the defendant to break the fibers directly infringed on the plaintiff's air ring. The newly discovered evidence advanced by the defendants relates to the air ring.

Prior to the development of the patent-in-suit, J–M produced fiberglass insulation fibers using the Rotary Fiberization technique, or the S–X process. This is an in-house designation at J–M which stands for "Simmers-Experimental." In this process, molten fiberglass material is introduced into a rotating disc, or spinner. As the spinner rotates at a high rate of speed, the glass is ejected through holes in the spinner, forming strands approximately 10 microns in diameter. A blast of hot gas generated by a high velocity blower attenuates, or stretches the fibers to a diameter of 7 microns, and breaks them into fibers approximately 1½″ long. This "hot gas blast attenuation" is essential to the conventional rotary process, both to create the proper diameter of fiber and to break it the appropriate length.[1]

In 1970, J–M set up an experimental facility in Richmond, Indiana to attempt to produce insulation quality fibers less than 7 microns in diameter by directly centrifuging glass fibers through holes of a small enough diameter so as to eliminate the need for the energy-intensive hot gas blast attentuation stage. This project was identified with the acronym HERM, representing horizontal laminar collection of the staple fibers, electric kettle molting of the glass, rotary fiberization and modular line. C. Donald Simmers was in charge of the group responsible for rotary fiberization. By late 1971 J–M was producing continuous fibers of the proper diameter using a spinner without hot gas attenuation. However, without the hot gas blast, there was nothing to break the fiber into the staple length appropriate for fiberglass insulation. Duane Faulkner, a defendant in this case, joined J–M's development group in June, 1972, to help solve this problem.

J–M first tried an air ring with a continuous slot to deflect the fibers downward for collection. When this failed, an air ring using discrete air jets was successfully developed. The air ring worked as follows:

Due to the placement and spacing between jets, "quiescent" zones are created. As a fiber is formed, it passes into the region of alternating air streams and

---

1. S–X technology is still used commercially by J–M and several of its competitors.

quiescent zones. An individual fiber will grow under the influence of centrifugal force until it is broken off by an air jet and blown down for collection. After the hole from which the fiber was extruded passes the jet and enters the next quiescent zone, new fiber begins to grow. The streams from the air ring are ambient and low pressure so that no attenuation occurs other than that caused by the centrifugal force imparted by the rotating rotor. There is no hot gas blast attenuation in the stream.

586 F.Supp. at 1048. The spinner and air ring combination was the basis for J–M's patent application filed on December 22, 1972, which eventually resulted in the issuance of the patent in suit, U.S. Patent No. 4,058,386, on November 15, 1977.

In its 1983 opinion, the court found that Guardian's Albion fiberizer and air ring:

[R]ead on the claims of the patent in suit by producing fibers less than 7M in diameter through holes less than 18 mils without hot gas blast attentuation, which fibers are then broken into staple lengths by streams of moving gas, alternating with relatively quiescent zones.

*Id.* at 1066. The court rejected Guardian's claim that its air ring did not infringe J–M's patent.

Despite extensive efforts, defendants have been unable to establish that the air ring performs any different function to the Albion line than it does for J–M. Plaintiff conducted tests and produced empirical evidence that both plaintiff's and defendants' air rings produce air streams and quiescent zones with comparable configurations. Defendants have relied solely on the testimony of Faulkner and Chenoweth to establish that in Albion's process, the fibers are burnt apart in the turbulent and erratic flame zone. *Defendant has offered no test data or other documentation to rebut the inference that defendants' air ring*

*is essential to fiberization to break the fibers just as is J–M's.* The Court concludes that defendants' use of an air ring with circumferentially spaced jets interspersed with which are relatively quiescent zones is a direct infringement of claims 1 and 6 of J–M's '386 patent.[2] [emphasis added]

*Id.* at 1067. Guardian's reliance on the addition by both J–M and itself of a heated spinner to the process was of no avail. Guardian claimed that fuel spillover from this improvement generated flame turbulence which broke the fibers rather than breaking the fibers with air jets. The court found that Guardian produced no data to substantiate this position. Further, it held that prior art instructed that turbulence was a problem that hindered the process, and that several patents had been granted which sought to reduce turbulence. *Id.* at 1068.

The court was explicit in its reliance on expert testimony to reach its conclusion, particularly that of Don Simmers.

Many of the Court's findings of fact rest on the Court's underlying determination of witness credibility. The factual issues in this case have been numerous, and nearly every issue has been hotly contested. Furthermore, the technical complexity has necessitated the Court's heavy reliance on expert testimony. Since plaintiff's expert Don Simmers, and defendants' expert, Duane Faulkner, have presented the Court with markedly differing versions of how the patented and accused processes work, the Court has been required to make an intuitive judgment as to the credibility of each witness, and abide by that where it has lacked the technical explanations to find its own way.

The court finds Don Simmers to have been a credible witness, whose testimony never lacked consistency, *and was verifiable by empirical evidence.* He consci-

---

**2.** The court also applied the doctrine of file wrapper estoppel to hold that the plaintiff was estopped from claiming an air ring which operates with a continuous stream of air without

quiescent zones. This finding was later withdrawn, as the doctrine of file wrapper estoppel is inapplicable where literal infringement is found. 223 U.S.P.Q. 974.

entiously acquitted his duty to inform and educate the Court.

On the other hand, Duane Faulkner was frequently a less than credible witness. Answers were often self-serving, evasive or in conflict with prior testimony. [emphasis added]

*Id.* at 1043. Central to the court's credibility determinations was the fact that Simmers' testimony was corroborated by empirical evidence derived from tests comparing the plaintiff's and defendants' machinery. The defendants never rebutted this evidence, and never presented any empirical evidence based upon their own tests. It is new testimony by Simmers which prompted this motion.

### 4. NEW TESTIMONY

J–M's November, 1985 amended complaint alleges that Guardian's Albion machinery, which now uses a continuous air ring as opposed to one with discrete jets, also infringes upon its patent. Pursuant to this claim, Simmers was deposed on April 29, 1986. The defendants claim that Simmers' 1986 deposition testimony directly contradicts the testimony he gave at trial. They allege that his new testimony supports the position advanced by the defendants at trial and rejected by this court: that the fibers are broken by flame turbulence rather than by the air jets. The relevant 1986 testimony follows:

Q. Let's turn if we may just a moment to the HERM process that employs the fuel spillover itself.

A. All right.

Q. What purpose or function is the fuel spillover serving?

A. Our original concept was that it maintained the plasticity of fibers which were already being attenuated so that further attenuation could be accomplished by the basic mechanism of centrifugal extrusion, if you will.

Q. What purpose was the air jet with the nozzle serving?

A. It was breaking the fiber, we believe originally.

Q. Are you still of that opinion?

A. I think not any more.

Q. What is your opinion today?

A. My opinion today is that the combustion taking place external of the disc is breaking the fiber.

Q. So the fuel spillover then is the mechanism for breaking the fibers?

A. For enhancing attenuation and breaking the fiber.[3]

Q. What forces—and where do they come from—break the fiber?

A. I would have to say it's from the combustion going on from the unburned gas which is spilled from the interior of the disc, then combusts external of the disc, creating flame fronts or combustion taking place, really.

Q. Is it the forces of turbulence that would break the fibers in your opinion?

A. I would think it is turbulence associated with combustion.

Dep. Tr. at 97.

Q. When did you come to change your opinion with regard to how the HERM process was operating?

A. I think Albion led the way and then we did tests at Richmond that firmed it up.[4]

Q. Tell me about what there was in those tests that led the way and firmed it up. You're talking about the Albion and the 10–85 test or the January '84 tests?

A. I think 10–85 was one of them, anyway.

Q. What was it?

A. Well, basically when the fuel was set such that there was no combustion taking place external of the disc, the fiber got very long. It was not being broken.

Q. How did that indicate to you that there was a change in the mechanism?

---

**3.** This is the conclusion rejected in the court's 1983 opinion. 586 F.Supp. at 1068.

**4.** Guardian's facility is located at Albion, Indiana, while J–M's facility is at Richmond, Indiana.

A. I didn't say there was a change in the mechanism. I said there was a change in recognition of it.

Dep. Tr. at 101.

Q. In your opinion, is the flame at Albion's fiberizer in 1985 that you looked at and the fuel spillover flame in the HERM creating enough force in those flames to break the fibers by whatever mechanism?

A. The—yes.

Dep. Tr. at 103.

Q. Are you of the opinion that turbulence is at least in part causing the breaking of the fibers?

A. I am of that opinion, yes.

Q. Do you have an opinion as to whether or not there is any difference in the breaking of the fibers in the fuel spillover as opposed to the flame zone of Albion?

A. I see the same end results in both mechanisms. Whether there's a difference taking place within it, I don't know.

Dep. Tr. at 104.

In a September 2, 1986, affidavit, Simmers states that his testimony regarding how the fibers are broken has not changed. Based on his prior experience, he did not expect the continuous air ring to work at all, as such a ring failed when used by HERM without a flame. Simmers' Affidavit at ¶ 9. It was this failure which led to the development of the air ring with discrete jets. Simmers maintains that Guardian's adjudicated fiberizer with discrete air jets, which he tested in 1981, broke the fibers with discrete air columns, not fire turbulence. Affidavit at ¶¶ 12, 15. It was only when Guardian's modified fiberizer at Albion was tested in 1985 that data showed the fibers were broken only when the flame was present. Affidavit at ¶¶ 10, 11. Simmers sums up:

> When I told Mr. Myers at my 1986 deposition that Guardian had taught me new principles for HERM, I had in mind the breaking that is achieved in the presence of flame with a continuous annular air ring. Of course, if the annular air ring is replaced by discrete air columns the breaking results from those columns, not the flame, as we proved in 1981.

Affidavit at ¶ 13.

A clue as to why Simmers' testimony changed can be found in the plaintiff's motion for preliminary injunction, filed on June 23, 1986. In its brief, J–M states that the heated spinner improvement, with the resulting fuel spillover and flame turbulence, was brought into production in 1975 without testing whether the flame obviated the need for the discrete air jets. Thus, the effect of flame turbulence in HERM was never tested by either party until 1985.

The 1985 tests which indicate that flame turbulence is a significant factor in breaking the fibers were "newly discovered" when Simmers was deposed in 1986. These tests, along with Simmers' testimony regarding them, are material to this case. However, the defendants have not shown why this evidence was not discovered earlier. The defendants had ten months from the time this action was filed to the beginning of trial. The trial itself lasted several weeks. The defendants had ample time to conduct the tests which the plaintiff eventually performed in October, 1985. The plaintiff found time to conduct tests comparing its machinery and that of the defendants in time for trial. The defendants have not shown why they were unable to do the same. This is especially troubling given that the defendants' theory of the case from the very beginning was that flame turbulence caused the fibers to break. Yet they did not introduce any empirical data based upon scientific tests to support this proposition. In its 1983 opinion, this court pointed out the defendants' failure to support their theory at trial regarding flame turbulence with empirical evidence. 586 F.Supp at 1068. Data from the 1985 experiments conducted by the plaintiff which arguably supports a theory held by the defendants since 1981 is better described as "belated evidence" rather than "new evidence."

Far from exercising due diligence, the defendants, to the court's knowledge,

have never conducted any tests to support their theory of the case. They were content to allow the plaintiff to undergo the cost of conducting experiments, and at trial relied upon testimony grounded in theory, not empirical data. Their post-trial conduct has been no different. They had several years to gather data to support their theory, yet did not. The defendants did not bring this motion until they discovered that the *plaintiff* had conducted tests which might support their theory. The defendants have not advanced a single reason why they conducted no post-trial experiments, and had to wait for the plaintiff to do their work for them. The Federal Circuit has written:

> The "due diligence" limitation serves the salutory purpose of providing finality to judicial orders by preventing belated attempts to reopen judgment on the basis of facts that the moving party could have discovered at the time of trial.

*Smith Intern. v. Hughes Tool Co.*, 759 F.2d 1572, 1579 (Fed.Cir.1985). A better description of the instant motion could not be written.

■ The defendants also have not convinced this court that this new evidence would be likely to cause a different result at trial. At trial, the plaintiff submitted experimental evidence based upon tests of the competing machinery which showed that the fibers from both machines were cut with or without flame turbulence, but that they were not broken without the air ring. The defendants have not challenged these findings, which were central to this court's reliance on Simmers' expert testimony.

The October, 1985 tests upon which the defendants base their motion were conducted upon the defendants' modified machinery which is the subject of the amended complaint. Thus, while Simmers arguably has changed his testimony regarding how the plaintiff's process works, there is no new evidence or testimony concerning the defendants' original machinery which has already been found to infringe on the plaintiff's patent.[5] The only evidence submitted in support of this motion concerns the relationship between the plaintiff's process and the defendants' modified process. This evidence does not directly address the object of the decision the defendants seek to reopen: the infringing nature of the defendants' original process. When reviewing a motion to reopen based upon new evidence, the court can only consider the new evidence actually produced. It cannot speculate as to what other new evidence the movants might unearth in the future.[6] The court is not convinced that Simmers' 1986 testimony regarding tests of the defendants' modified machinery would probably produce a different result on the issue of whether the defendants' original process violated the plaintiff's patent.

■ The remaining grounds raised by the defendants to support the request to reopen the 1983 judgment are not convincing. They share the claim that the plaintiff had some evidence in its possession which it hid from the defendant, the court, or the Patent Office. Establishing that a patent was procured by fraud requires clear, unequivocal and convincing evidence of intentional misrepresentations or withholding of material facts; mere evidence of negligence, oversight or erroneous judgment will not suffice. *Orthopedic Equip. Co. v. All Orthopedic Appliances*, 707 F.2d 1376, 1383 (Fed.Cir.1983). The defendant often confuses the issue by focusing on the issue of fraud, rather than the standards which guide this court in considering a motion to

---

5. In fact, the October, 1985 tests would not have even been conducted had not the defendant modified its machinery in an attempt to avoid the plaintiff's patent. This new evidence was discovered as a result of chance rather than diligence.

6. It once again reflects upon the defendants' failure to exercise due diligence that they did not submit any evidence of tests that they conducted on the original machinery, relying instead solely upon the plaintiff's tests of the modified machinery. There is no reason why the court should be asked to rely upon what is essentially circumstantial evidence to decide this motion.

reopen. Whatever the degree of misconduct in front of the PTO is tolerable, *see, e.g., A.B. Dick Co. v. Burroughs Corp.,* 798 F.2d 1392, (Fed.Cir.1986) the issue before the court is what new evidence is now being brought forth and why wasn't it submitted to the court during the trial in 1981. The defendants have not shown that they exercised reasonable diligence in discovering this allegedly new evidence, in some instances even admitting they had it in their possession all along.[7]

## 5. MOTION TO AMEND

The defendants also seek to amend their answer to the plaintiff's amended complaint to allege that the plaintiff's patent is invalid. They argue that the amended complaint is effectively a new case to which the defendants may raise any defense subject only to the doctrine of *res judicata.* This misconstrues the procedural posture of this case. The plaintiff's patent has already been held valid, both by this court and the Court of Appeals for the Federal Circuit. The defendants cannot force the plaintiff to relitigate the validity of its patent *ad infinitum* by forcing continuing enforcement of the patent through a change of the allegedly infringing conduct.

It is the law of this case that the plaintiff's patent is valid. The defendants cannot be allowed to amend their answer to challenge the validity of the patent unless they produce evidence which is "substantially different" from that introduced at the earlier trial, and show that they exercised "due diligence" in discovering that evidence. *Smith Intern.,* 759 F.2d at 1579. For the reasons set forth in some detail above, the court finds that the doctrine of the law of the case precludes the defendants from amending their answer to challenge the validity of the plaintiff's patent.

## 6. CONCLUSION

The evidence submitted in support of this motion, which is really that derived from the plaintiff's October, 1985 tests rather than Simmers' 1986 testimony, should and could have been presented at the original trial. Further, the evidence does not directly address what was adjudicated in 1983. It is based upon tests involving the defendants' modified machinery and therefore leaves the evidence based upon tests of the defendants' original machinery unrebutted. While the new evidence may be relevant to a new understanding of the patent, it does not directly address the object of this motion: whether this court's decision that the defendants' original process violated the plaintiff's patent should be reopened. Accordingly, the defendants' motions to reopen and to amend their answer are denied.

IT IS SO ORDERED.

---

7. For instance, the defendants attack Simmers' (plaintiff's expert) assertion at trial that he knew little of certain German prior art by producing documents authored by Simmers referring to the German process. However, the defendants admit the plaintiff produced these documents before trial. The defendants also claim that certain prior art from the Soviet Union was withheld from both the Patent Office and this court. They admit, once again, that the plaintiff produced copies of the Soviet patents prior to trial.