Donald Rayburn JONES et al.

v.

SUPERINTENDENT.

Michael Gayle GALLAHAN

v.

E. A. HENRY, Superintendent.

Donald Rayburn JONES

v.

SUPERINTENDENT.

Civ. A. Nos. 73–C–56–H to 73–C–58–H.

United States District Court,
W. D. Virginia,
Harrisonburg Division.

Jan. 18, 1974.

William A. Carter, III, Asst. Atty.
Gen., Richmond, Va., for respondent.

OPINION and JUDGMENT

DALTON, District Judge.

Civil Action No. 73–C–56–H was filed on October 31, 1973, by petitioners Donald R. Jones, Robert E. Titdale, and Michael G. Gallahan, inmates of White Post Correctional Field Unit #7, White Post, Virginia, on a complaint which this court will construe as one filed pursuant to 42 U.S.C. § 1983. Petitioners seek damages in the amount of $100,000 and injunctive relief against J. D. Terry, former Acting Superintendent of Unit #7, and other Unit #7 correctional staff personnel for alleged shortcomings in the conditions of confinement met by petitioners during stays in the isolation cells at the field unit.

In Civil Action No. 73–C–57–H, filed on October 31, 1973, Michael G. Gallahan, a vegetarian, seeks damages in the amount of $10,000 for allegedly having been deprived of an adequate meatless diet while serving a stint of fifteen days in isolation at Unit #7.

In Civil Action No. 73–C–58–H, filed on October 31, 1973, Donald R. Jones seeks an injunction that would prohibit employees of the Virginia Division of Corrections from taking any retaliatory action against him or his fellow litigators in the above two cases, or otherwise interfering with their pursuance of that litigation.

Upon motion of the respondents, this court by order of December 4, 1973, ordered the above three cases consolidated. Respondents have moved for the consolidation of two other cases filed by Donald R. Jones, Civil Actions No. 73–C–55–H and No. 73–C–65–H, which involve the earlier removal of Jones from the study release program at Correctional Field Unit #8, Linville, Virginia, and his subsequent transfer to Unit #7. The court will consolidate those two cases, but not with the cases herein, as the allegations in Nos. 73–C–55–H and 73–C–65–H concern events that transpired at Unit #8. Respondents' motion to consolidate these two cases herein is therefore denied.

Civil Action No. 73–C–56–H was filed during the fifteen-day confinement in isolation of petitioners Jones, Tisdale and Gallahan after they were found guilty of institutional infractions by Unit #7's Adjustment Committee; those findings are not at issue. Jones and Gallahan began confinement on October 18, 1973; Tisdale on October 19, 1973. Petitioners' allegations can be summarized as follows:

1. Infrequent attention was paid to inmates in isolation, specifically from 12 midnight to 2:00 p. m. on October 24, 1973, when no one entered the isolation area to attend to medicinal or hygenic needs, even though several count checks were made and one meal was served. One petitioner says that he was to receive medication on request, another that he was to receive medicine every four hours.

2(a). The unit physician never visits the isolation cells.

2(b). The Superintendent has threatened petitioners with disciplinary action if the physician finds that they are faking illness.

3. Meals for men in isolation are not the same as meals served the regular prison population; seconds are not allowed; meals are often late and cold.

4(a). No implements with which the cells may be cleaned are issued to isolation inmates.

4(b). Serving trays with food scraps are often left lying in the hallway from one meal to the next, and attract vermin.

5. Heating equipment is outdated and often inoperative.

6. What personal property will be allowed to be retained in the isolation cells is arbitrarily decided.

7. Isolation cells are not furnished with desks, chairs or tables, and lighting is inadequate for reading after darkness.

8. There is no opportunity for exercise while in isolation.

9. Adjustment committee proceedings are "cut-and-dried affairs."

10. Inmates have limited access to unit administrators.

11. Petitioners have been harassed and verbally abused on occasion.

█ Respondents have submitted records and affidavits to support their motion for summary judgment upon the ground that none of the above allegations contain facts that elevate the claims to constitutional dimensions. Petitioner Jones, who drafted the complaint, has submitted a memorandum in support of his motion in opposition to respondents' motion for summary judgment. The court has carefully considered the record, and agrees with respondents' contention that summary judgment in their favor is in order. "It is only when the deprivations of prison confinement impose conditions of such onerous burdens as to be of constitutional dimensions that courts may intervene in prison management." Breeden v. Jackson, 457 F.2d 578 (4th Cir. 1972).

█ Petitioners' complaints do not reach the level deemed actionable in Breeden v. Jackson, *supra.* They complain that they were denied medical assistance for some fourteen hours on October 24, 1973, but not one individual is identified as having suffered from the alleged deprival. The isolation cells inspection sheet for that date, which has been made a part of the record, shows that correctional staff members came through the isolation area hourly that day, as they are required to do. The record indicates that both Jones and Tisdale received medications on the date of October 24, 1973. In addition, the reports covering the petitioners' stay in isolation are replete with instances of at least two of the inmates refusing to take medication. Indeed, the record tends to bear out respondents' contention that at least one of the petitioners, Jones, was using sick call as a subtle means of harassing the guard personnel. He had been seen on some twelve occasions for various ailments by the

unit physician since August 8, 1973, but had refused on three separate occasions to undergo a complete physical examination, for which appointments had been made in an attempt to ascertain Jones' true state of health. Respondents admit to some annoyance at having to repeatedly take "malingerers" to the doctor, but emphatically deny that any threats concerning medical care have been made. All of the petitioners have made frequent trips to see the unit physician, and there is no indication of any staff interference with either their consultations or treatment.

Division of Corrections Guideline No. 800, Page 15, Paragraph I (April 16, 1973) states that "[a]n appropriate member of the medical staff will visit the isolation unit daily to determine medical needs of any inmate assigned to the unit." By respondents' own admissions, this procedure is not followed in the isolation cells at Unit #7. W. D. Blankenship, Area Administrator for the Bureau of Correctional Units, admits in his affidavit that the unit physician "rarely" visits the isolation cells, but states that inmates needing medical care are taken to the doctor in the unit dispensary, where the medications and medical equipment are located, rather than having the doctor going to them. Even though the Division's guideline is not literally being followed, as petitioners have not been demonstrably injured by this procedure, no relief on this ground is appropriate. The Division would be well advised, however, that when it promulgates its own standards, and makes them known to the inmates, it should in all fairness attempt to fully implement such standards.

The allegations with respect to meals (save for the complaints of petitioner Gallahan, which are examined in Civil Action No. 73–C–57–H), lack of cleaning implements, the problem of residual serving trays, deprivations of personal property, lack of furnishings, and lack of exercise, in the opinion of this court, are all on the level of the usual incidents of confinement in isolation. *See* Breed-

en v. Jackson, *supra*. Respondents state that petitioners' meals were regularly prepared in the unit kitchen, and that those in isolation receive two meals a day, without dessert or seconds, as called for in the Division Guidelines. Those in isolation are fed as much as other non-working inmates, and are served before the general unit population is, according to respondents. Housecleaning implements are denied those in isolation, to prevent their possible use as weapons. Respondent affiant L. F. Jenkins, a guard sergeant at Unit #7, states that inmate "housemen" are brought into the isolation cell area approximately every other day to clean up. While the solitary cell inspection sheets submitted as part of the record do not indicate such diligence, they do reveal that at least once, upon the inmates' request, the cells were cleaned. By petitioners' own allegations, however, the condition of the cells do not appear to have been so unfit as to warrant relief. Nor does the practice of occasionally leaving empty food trays outside cell doors merit the intervention of this court. The books that petitioner Jones had removed from his cell were determined to be neither religious or legal in nature, which were the only types of books allowed in the isolation cells. All inmates in isolation are allowed uniform privileges and possessions, and if any inmate had personal items denied the others, it was a result of an official oversight, according to respondents. The isolation cells are equipped with a bed, a toilet, a sink, and a light which is recessed into the wall. The furnishings, concededly quite spartan, create discomfort and temporary inconveniences to inmates, to be sure, but not of such a nature as to be the basis for judicial relief. Respondent Jenkins states that he even allowed Jones to bring a personal portable light into his cell to use. Denial of the use of recreational facilities is likewise no ground for relief (the maximum time that an inmate can spend in isolation is fifteen days). *See* Breeden v. Jackson, *supra*.

Petitioners contend that the heating equipment in the isolation area is "outdated and often inoperative," resulting in inmates being exposed to the weather. Respondent Jenkins says that two portable electric heaters were placed in the outside hallway in the isolation area after complaints about the temperature were received from petitioners. In keeping with Division Guidelines, the isolation area guards kept an hourly log of the temperature in the isolation area during petitioners' confinement. Those logs reveal that the lowest temperature recorded during that period was 65° F., and that after October 20, 1973, the temperature was usually maintained at 75° or more. The log also shows that petitioner Gallahan was asked almost daily not to leave his cell window open, and that on more than one occasion, the petitioners asked for and received cups of ice. This complaint appears to be completely frivolous.

Petitioners contend that prison administrators ignored their requests for interviews, but the isolation area log indicates that the isolation cells were visited by Lt. L. E. Payne, the Assistant Superintendent, on October 24, 1973, by Acting Superintendent J. D. Terry on October 25 and 26, and by Area Administrator W. D. Blankenship on October 24 and 29. In addition to these visits, guards are in the area hourly.

Petitioners state that in several instances they were "harassed and verbally abused." The record reveals to this court that if this type haranguing went on, it was not a one-sided affair on the part of the prison personnel. At any event, mere words, however violent, do not amount to an assault such as to be actionable under § 1983. Johnson v. Glick, 481 F.2d 1028 (2nd Cir. 1973).

Lastly, petitioners contend that Adjustment Committee proceedings and appeals procedures are "cut-and-dried affairs." Specifically, petitioner Jones says that his request for administrative review of the Adjustment Committee's decision in his hearing and for partial suspension of his fifteen day isolation

term had been denied by the Acting Superintendent in a letter dated prior to Jones' request for such review. This appears highly unlikely, as Supt. Terry's reply specifically addresses issues raised by petitioner in his request. Absent any other illustrative example of the alleged unconcern of Unit #7 personnel with such procedures, this court is powerless to act. The record discloses no irregularities in Jones' Adjustment Committee hearing of October 18, 1973, on charges of refusing to obey a direct order from a unit administrative officer.

This court is of the opinion that petitioners have stated no claims warranting either injunctive relief or monetary compensation. Accordingly, respondents' motion for summary judgment is hereby granted.

## GALLAHAN

In Civil Action No. 73–C–57–H, which was filed during the same period of isolation confinement as discussed in the case above, Michael G. Gallahan seeks damages in the amount of $10,000 for allegedly having been deprived of meat substitutes during his confinement in isolation. While the complaint alleges no jurisdictional basis, it will be construed as having been filed pursuant to 42 U.S.C. § 1983. Gallahan is a non-meat eater who bases his preference in diet upon religious beliefs, upon his observation of the relative differences in behavior of carnivorous and herbivorous animals in captivity, and upon the fact that purine is present in meats, which he says gives rise to cholesterol. While Gallahan does not claim any particular religious faith, respondents say that his religious beliefs are oriented toward "Eastern" sects. While in the regular unit population, Gallahan supplemented his meatless diet with "special foods" from his family, but was denied these special foods while in isolation by respondents, who contend that it would be unfair to treat one inmate in isolation differently than others in respect to the type of food served.

Gallahan was admitted to isolation on October 18, 1973, and alleges that until October 27, 1973, he ate nothing save meatless vegetables and fruits available by way of the regular fare given him. On October 27, Gallahan was seen by Dr. G. U. Otten of Front Royal, Virginia, who noted on Gallahan's medical card that he was healthy and that "perhaps vegetable substitutes for meat on his tray would be of benefit to ensure the proper number of calories necessary to keep him healthy." Accordingly, the isolation area log reveals that on October 28, petitioner was provided with substitute fruits and vegetables; on October 29, with extra vegetables; on October 30, with three apples, extra applesauce and cereal; and on October 31, with extra vegetables, extra applesauce and honey. On October 31, 1973, Gallahan was seen by Dr. E. M Estham, who noted on his medical card that Gallahan was healthy, but was still unsatisfied with his diet; the doctor recommended vegetable substitutes to keep him healthy. On November 1, 1973, Gallahan was released from isolation status.

Division Guideline No. 800, Page 13, Paragraph D (April 16, 1973) states that while in isolation "[i]n no event will prisoners be deprived of their necessary daily minimum requirements of caloric content." The Guidelines further state that "[w]henever a prisoner refuses to eat a meal a record will be made on the jail disciplinary report." The latter guideline does not seem to have been scrupulously followed in Gallahan's case. There is no record of him refusing meat between October 18 and 27, 1973, when, of his own accord, he allegedly ate nothing save fruits and vegetables. The court is concerned that Gallahan may have been deprived of the "necessary daily minimum requirements of caloric content" by the nature of the food served him during the first ten days of his confinement. Whether he was or not cannot directly be determined from the record. The record does reveal, however, that Gallahan had once before similarly "fasted" during a week-

long stay in the isolation cells in February, 1973, and upon being examined by a physician after the week of fasting, the physician, Dr. David Pollack, noted that he "[saw] no harm in [Gallahan] continuing as he is doing now." The medical evidence therefore would tend to indicate that Gallahan was suffering no noticeable physical harm during his periods of fasting.

While the diet available to Gallahan was significantly better than the bread and water regimen enjoined in Landman v. Royster, 333 F.Supp. 621 (E.D.Va.1971), this court will not countenance depriving an inmate in isolation of a diet of the same caloric content as received by other isolation inmates by knowingly serving him foods that he will reject, at least when the rejection is based upon arguably religious grounds. In such a case, every effort should be made to ensure that reasonable substitutes are made available to meet the minimum daily caloric requirements. The diet imposed in isolation is limited enough (two meals a day, no seconds or desserts, water for a beverage).

In the case at hand, the court realizes that while a wrong may have been done, Gallahan has not set forth any real injury or damage to himself, and his medical record reveals no injury. Respondents acted throughout upon the advice of medical doctors, and, they say, upon the advice of Brian Miller, an attorney for the Division of Corrections. Accordingly, no damages will be awarded, and summary judgment granted respondents on the issue of damages.

## INJUNCTION

Civil Action No. 73–C–58–H is a petition for injunctive relief, which this court will consider as one having been filed pursuant to 42 U.S.C. § 1983. Petitioner Donald R. Jones alleges that the staff personnel at Unit #7 have taken retaliatory measures against him designed to hinder the prosecution of the litigation that he and two other inmates instituted in Civil Action No. 73–C–56–H. The volume of correspondence from Jones to this court on behalf of that and other suits he has filed, and the fact that he has filed yet another suit since No. 73–C–58–H, belie this contention. At any event, the resolution by this court of No. 73–C–56–H as above, and the transfer of Jones from Unit #7 to the Virginia State Farm have mooted Jones' petition. Accordingly, respondents' motion for summary judgment is hereby granted.

## EXHAUSTION

Respondents have argued in all three of the above cases that the petitioners have not exhausted available administrative remedies by way of the administrative grievance procedure recently set up in the Virginia Correctional System before filing their petitions in this court. At this date, the rule in the Fourth Circuit remains that exhaustion of state administrative remedies is not required before filing a § 1983 action. Cases on this point are legion.

McCann v. Moss, Civil Action No. 73–C–61–L (W.D.Va. October 26, 1973), cited by respondents for the principle that exhaustion is required, to the contrary does not so hold, and giving it such construction is making a mountain out of a molehill. McCray v. Burrell, 367 F.Supp. 1191 (D.C.Md.), for which a notice of appeal was filed in the Fourth Circuit Court of Appeals on November 30, 1973, is applicable at present only in Maryland, where the court found an Inmate Grievance Commission created by the Maryland General Assembly to be a workable remedy for processing prisoner grievances before they reach the federal courts. Whether the Administrative Grievance Procedure for Inmates Incarcerated within the Virginia Correctional System will be found to be similarly effective will be determined by this court in a proper case, but as of now that route of exhaustion will not be required.

The clerk is directed to send a certified copy of this opinion and judgment to each petitioner in the above cases, and to counsel for respondents.