Linda Gail NIECE and Grant H. Hendrick, on behalf of all other similarly situated people with disabilities, Plaintiffs,

v.

Deputy Warden Pat FITZNER; Director Kenneth McGinnis; Warden Richard Johnson; Assistant Resident Unit Manager Tabor; Inspector Lockwood; Assistant Deputy Warden Roberts; Captain Hancock; Special Assistant Brown; Michigan Department of Corrections, the individuals are being sued in their individual and official capacities, Defendants.

Civil Action No. 94–CV–70718–DT.

United States District Court, E.D. Michigan, Southern Division.

Oct. 10, 1996.

Daniel E. Manville, P.C. by Michael J. Steinberg, Ann Arbor, MI, for plaintiffs.

Frank J. Kelly, Attorney General for the State of Michigan by A. Peter Govorchin, Assistant Attorney General, Lansing, MI, for defendants.

## ORDER ACCEPTING MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

BORMAN, District Judge.

The Court has reviewed the Magistrate Judge's Report and Recommendation submitted herein, and any all timely objections filed thereto. The Report and Recommendation is hereby accepted. Accordingly,

IT IS ORDERED that Defendant's Motion to Dismiss Plaintiffs' claims under the Americans with Disabilities Act and the Rehabilitation Act is DENIED. Extensive research has provided ample authority to support the Magistrate Judge's Report and Recommendation concluding that Plaintiffs are not barred from bringing suit against Defendants under either Act.

## REPORT AND RECOMMENDATION

KOMIVES, United States Magistrate Judge.

### RECOMMENDATION

The Court should deny defendants' motion to dismiss plaintiffs' claims under the Americans with Disabilities Act and the Rehabilitation Act of 1973.

### REPORT

I. *Procedural Background*

Plaintiffs Linda Gail Niece (Niece) and Grant H. Hendrick (Hendrick) bring this claim against defendants Michigan Department of Corrections and certain MDOC employees assigned to the Carson City Temporary Facility (OTF) in Carson City, Michigan. Hendrick is a low-security inmate at OTF, and is engaged to Niece. Niece is deaf, and is also confined to a wheelchair due to a neurological disorder called ataxia. Plaintiffs filed their complaint in 1994 pursuant to Titles II and IV of the Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12131–12134, 12203; Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794; 42 U.S.C. § 1983 and the First Amendment to the United

States Constitution; and the Michigan Handicappers Civil Rights Act, MICH.COMP. LAWS §§ 37.1101 *et seq.* The complaint relates to certain alleged actions taken by the prison officials in regard to telephone communication between Hendrick and Niece, and in regard to visitations at the prison by Niece.[1]

On May 18, 1995, defendants filed a motion to dismiss plaintiffs' ADA claims against them. They argued that Hendrick lacks standing to pursue a claim under the ADA because he is not disabled, and that Niece cannot establish that she was discriminated against. On August 25, 1995, I issued a Report recommending that defendants' motion be denied, except as to defendants Lockwood and Roberts, whose actions occurred prior to the adoption of the ADA. On March 29, 1996, Judge Borman accepted this Report & Recommendation and entered an Order denying defendants' motion to dismiss except as to defendants Lockwood and Roberts.

On May 13, 1996, defendants filed a second motion to dismiss plaintiff's claims under the ADA and section 504 of the Rehabilitation Act (section 504). Defendants argue that the claims against them under the ADA and section 504 are barred by the Eleventh Amendment to the United States Constitution, and that plaintiffs have failed to state a claim upon which relief can be granted because the ADA and section 504 do not apply to state prisons. On June 11, 1996, plaintiffs filed their brief in opposition to defendants' motion, arguing that Congress has abrogated the state's Eleventh Amendment immunity and that the ADA and section 504 do apply to state prisons.

## II. *Eleventh Amendment Immunity*

### A. *Eleventh Amendment Immunity Generally*

■ The Eleventh Amendment provides:

> The Judicial power of the United States shall not be construed to extend to any suit

in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

U.S. CONST. amend. XI. Although the amendment expressly prohibits only suits against states by citizens of other states, the Supreme Court has long held that the Eleventh Amendment also bars suits by citizens of the state being sued. *See, Hans v. Louisiana,* 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890); *Welch v. Texas Dep't of Highways and Public. Transp.,* 483 U.S. 468, 472–73, 107 S.Ct. 2941, 2945–46, 91 L.Ed.2d 389 (1987) (plurality opinion). This immunity is based on a two part presupposition: (1) each state is a sovereign entity; and (2) "it is inherent in the nature of sovereignty not to be amenable to the suit of an individual without its consent." THE FEDERALIST No. 81, at 487 (Alexander Hamilton) (Clinton Rossiter ed. 1961); *see Seminole Tribe of Florida v. Florida,* —— U.S. ——, ——, 116 S.Ct. 1114, 1122, 134 L.Ed.2d 252 (1996); *Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.,* 506 U.S. 139, 146, 113 S.Ct. 684, 688–89, 121 L.Ed.2d 605 (1993); *Hans,* 134 U.S. at 13, 10 S.Ct. at 506. Thus, "in the absence of consent a suit in which the State or one of its agencies or departments is named as the defendant is proscribed by the Eleventh Amendment." *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 100, 104 S.Ct. 900, 908, 79 L.Ed.2d 67 (1984); *see also, Papasan v. Allain,* 478 U.S. 265, 276, 106 S.Ct. 2932, 2939, 92 L.Ed.2d 209 (1986). Further, as the Supreme Court made clear in *Will v. Michigan Dep't of State Police,* 491 U.S. 58, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989), the Eleventh Amendment bars suits against state officials sued in their official capacity. *See also,* U.S. CONST. amend. XI.

### B. *Abrogation of Eleventh Amendment Immunity*

■ Despite this bar from suit, in certain limited instances Congress may abrogate the Eleventh Amendment immunity of the states by allowing suits through federal statutes.

---

1. The relevant facts alleged in the complaint are set forth in detail in my Report & Recommendation of August 25, 1995, at pages 1–6. Accordingly, they are not set forth in detail again here.

Judge Borman's Order and my Report are reported at *Niece v. Fitzner,* 922 F.Supp. 1208 (E.D.Mich.1996).

In order to determine whether Congress has abrogated the States' sovereign immunity, we ask two questions: First, whether Congress has "unequivocally expresse[d] its intent to abrogate the immunity"; and second, whether Congress has acted "pursuant to a valid exercise of power." *Seminole Tribe,* —— U.S. at ——, 116 S.Ct. at 1123 (quoting *Green v. Mansour,* 474 U.S. 64, 68, 106 S.Ct. 423, 425–26, 88 L.Ed.2d 371 (1985) (citations omitted)). Thus, the Court must consider each of these questions in turn.

### 1. Unequivocal Expression of Intent to Abrogate Immunity

■ "Congress' intent to abrogate the States' immunity from suit must be obvious from 'a clear legislative statement.'" *Seminole Tribe,* —— U.S. at ——, 116 S.Ct. at 1123 (quoting *Blatchford v. Native Village of Noatak and Circle Village,* 501 U.S. 775, 786, 111 S.Ct. 2578, 2584, 115 L.Ed.2d 686 (1991)). "A general authorization for suit in federal court is not the kind of unequivocal statutory language sufficient to abrogate the Eleventh Amendment." *Atascadero State Hosp. v. Scanlon,* 473 U.S. 234, 246, 105 S.Ct. 3142, 3149, 87 L.Ed.2d 171 (1985); *accord Blatchford,* 501 U.S. at 786 n. 4, 111 S.Ct. at 2585 n. 4 ("The fact that Congress grants jurisdiction to hear a claim does not suffice to show Congress has abrogated all defenses to that claim."). Thus, "Congress may abrogate the States' constitutionally secured immunity from suit in federal court only by making its intention unmistakably clear in the language of the statute." *Dellmuth v. Muth,* 491 U.S. 223, 227–28, 109 S.Ct. 2397, 2400, 105 L.Ed.2d 181 (1989); *see also, Welch,* 483 U.S. at 474, 107 S.Ct. at 2946.

#### a. Abrogation of Immunity Under the ADA

■ The ADA contains a clear expression of Congress' intent to abrogate the states' Eleventh Amendment immunity. Under the ADA:

A State shall not be immune under the eleventh amendment to the Constitution of the United States from an action in Federal or State court of competent jurisdiction for a violation of this chapter. In any action against a State for a violation of the requirement. of this chapter, remedies (including remedies both at law and in equity) are available for such a violation to the same extent as such remedies are available for such a violation in an action against any public or private entity other than a State.

42 U.S.C. § 12202. "Section 12202 of the ADA is an unequivocal expression of Congress' intent to abrogate the States' Eleventh Amendment immunity." *Martin v. Voinovich,* 840 F.Supp. 1175, 1187 (S.D.Ohio 1993); *accord Eisfelder v. Michigan Dep't of Natural Resources,* 847 F.Supp. 78, 82–83 (W.D.Mich.1993).

#### b. Abrogation of Immunity Under the Rehabilitation Act

■ Likewise, Congress as unequivocally expressed its intention to abrogate the Eleventh Amendment of the states under the Rehabilitation Act of 1973. In *Atascadero State Hospital,* *supra,* the Supreme Court held that the Rehabilitation Act, as then enacted, did not properly abrogate the states' Eleventh Amendment immunity. Thus, to correct this oversight, Congress amended the Act in 1986 to include a provision abrogating Eleventh Amendment immunity:

A State shall not be immune under the Eleventh Amendment of the Constitution of the United States for a violation of section 794 of Title 29 [ (section 5 of the Rehabilitation Act) ] ... or the provisions of any other Federal statute prohibiting discrimination by recipients of Federal financial assistance.

42 U.S.C. § 2000d–7(a); *see* S.REP. No. 388, 99th Cong., 2d Sess., at 27–28 (indicating that the abrogation of immunity provision was in direct response to the Court's decision in *Atascadero State Hospital* ). "Accordingly, the Eleventh Amendment does not prevent plaintiffs from making claims against defendants under § 504 of the Rehabilitation Act." *Martin,* 840 F.Supp. at 1187; *accord Eisfelder,* 847 F.Supp. at 82–83.

### 2. Abrogation Made Under a Proper Exercise of Authority

Because Congress clearly and unequivocally expressed its intention to abrogate Elev-

enth Amendment immunity both under the ADA and under section 504, the Court must next consider whether this abrogation was done under a proper exercise of Congress' authority.

### a. *Seminole Tribe and Abrogation Under the Commerce Clause*

The Supreme Court recently addressed this matter in *Seminole Tribe, supra.* In *Seminole Tribe,* the Court, in a 5–4 decision, held that the Commerce Clause, U.S. CONST. art. I, § 8, cl. 3, does not confer upon Congress the authority to abrogate a state's Eleventh Amendment immunity from suit in federal courts. The Court held:

> Even when the Constitution vests in Congress complete law-making authority over a particular area, the Eleventh Amendment prevents congressional authorization of suits by private parties against unconsenting States. The Eleventh Amendment restricts the judicial power under Article III, and Article I cannot be used to circumvent the constitutional limitations placed upon federal jurisdiction.

*Seminole Tribe,* —— U.S. at —— – ——, 116 S.Ct. at 1131–32. Based on this holding, defendants argue that Congress could not have abrogated Eleventh Amendment immunity under the ADA and the Rehabilitation Act because these were both enacted under the Congress' Commerce Clause power.

### b. *Abrogation under the Fourteenth Amendment*

■ To the extent that the ADA and the Rehabilitation Act were enacted solely under the commerce power, defendants' argument

would, of course, prevail. However, both the ADA and the Rehabilitation Act were also enacted under Congress' explicit power to enforce the 14th Amendment "by appropriate legislation." U.S. CONST. amend · XIV, § 5; *accord* 42 U.S.C. § 12101(b)(4) ("It · is the purpose of [the ADA] ... to invoke the sweep of congressional authority, *including the power to enforce the fourteenth amendment* and to regulate commerce, in order to address the major areas of discrimination faced day-to-day by people with disabilities.") (emphasis added); S.REP. No. 388, 99th Cong., 2d Sess., at 27 (stating that the abrogation of Eleventh Amendment immunity in 42 U.S.C. § 2000d–7 was in response to the *Atascadero* Court's indication that such an abrogation would be permissible under section 5 of the Fourteenth Amendment).[2]

In *Fitzpatrick v. Bitzer,* 427 U.S. 445, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976), the Court held:

> [W]e think that the Eleventh Amendment, and the principle of state sovereignty which it embodies, are necessarily limited by the enforcement provisions of § 5 of the Fourteenth Amendment. In that section Congress is expressly granted authority to enforce "by appropriate legislation" the substantive provisions of the Fourteenth Amendment, which themselves embody significant limitations on state authority. When Congress acts pursuant to § 5, not only is it exercising legislative authority that is plenary within the terms of the constitutional grant, it is exercising that authority under one section of a constitutional Amendment whose other sections by their own terms embody limitations on

---

2. Although Congress did not explicitly state that it was enacting the Rehabilitation Act or the abrogation of Eleventh Amendment immunity under 42 U.S.C. § 2000d–7 pursuant to its enforcement powers under the Fourteenth Amendment, this can be fairly inferred from the findings and purposes behind the Rehabilitation Act, *see* 29 U.S.C. § 701, and from the Senate Report relating to 42 U.S.C. § 2000d–7. "The ... constitutionality of action taken by Congress does not depend on recitals of the power which it undertakes to exercise." *Woods v. Cloyd W. Miller Co.,* 333 U.S. 138, 144, 68 S.Ct. 421, 424, 92 L.Ed. 596 (1948). Accordingly, the Supreme Court has noted:

> It is in the nature of our review of congressional legislation defended on the basis of Congress' powers under § 5 of the Fourteenth Amendment that we be able to discern some legislative purpose or factual predicate that supports the exercise of that power. That does not mean, however, that Congress need anywhere recite the words "section 5" or "Fourteenth Amendment" or "equal protection".... *Equal Employment Opportunity Comm'n v. Wyoming,* 460 U.S. 226, 243 n. 18, 103 S.Ct. 1054, 1064 n. 18, 75 L.Ed.2d 18 (1983). Thus, it is proper for the Court to infer that Congress intended to invoke its Fourteenth Amendment enforcement powers in enacting the Rehabilitation Act.

state authority. We think that Congress may, in determining what is "appropriate legislation" for the purpose of enforcing the provisions of the Fourteenth Amendment, provide for private suits against States or state officials "*which are constitutionally impermissible in other contexts.*"

*Id.* at 456, 96 S.Ct. at 2671 (citation omitted) (footnote omitted) (emphasis added). Although holding that the Commerce Clause does not provide proper authority for Congress to abrogate the states' Eleventh Amendment immunity, the Court's decision in *Seminole Tribe* left untouched the *Fitzpatrick* holding that section 5 of the Fourteenth Amendment does provide such authority. In distinguishing *Fitzpatrick,* the Court reasoned:

> *Fitzpatrick* was based upon a rationale wholly inapplicable to the Interstate Commerce Clause, viz., that the Fourteenth Amendment, adopted well after the adoption of the Eleventh Amendment and the ratification of the Constitution, operated to alter the preexisting balance between state and federal power achieved by Article III and the Eleventh Amendment.

*Seminole Tribe,* —— U.S. at ——, 116 S.Ct. at 1128. Further, the majority's opinion characterized the cases cited in Justice Stevens' dissent as being inapplicable in the Commerce Clause setting because "those cases arose in the context of a statute passed under the Fourteenth Amendment, *where Congress' authority to abrogate is undisputed.*" *Id.* at —— n. 15, 116 S.Ct. at 1131 n. 15 (emphasis added). Finally, in his dissent, Justice Stevens also construes the Court's opinion as preserving Congress' power to abrogate the states' Eleventh Amendment immunity under section 5 of the Fourteenth Amendment. *See id.* at ——, 116 S.Ct. at 1134 (Stevens, J., dissenting). Accordingly, so long as the ADA and the Rehabilitation Act were properly enacted under section 5 of the Fourteenth Amendment, Congress' abro-

gation of Eleventh Amendment immunity was proper.

#### c. Congressional Authority to Enact the ADA and the Rehabilitation Act under the Fourteenth Amendment

■ As noted above, section 5 of the Fourteenth Amendment states: "The Congress shall have power to enforce, by appropriate legislation, the provisions of this article." U.S. CONST. amend. XIV, § 5. Among the provisions of the Fourteenth Amendment which Congress may so enforce is the right of citizens to enjoy "the equal protection of the laws." U.S. CONST. amend. XIV, § 1. Although the primary purpose behind the Fourteenth Amendment when originally enacted was to protect the rights of African-Americans, Congress has broad power under the amendment to enact legislation against an array of various types of discrimination.

In *Katzenbach v. Morgan,* 384 U.S. 641, 86 S.Ct. 1717, 16 L.Ed.2d 828 the Court recognized Congress' broad powers under section 5 of the Fourteenth Amendment:

> Thus the *McCulloch v. Maryland* standard is the measure of what constitutes "appropriate legislation" under § 5 of the Fourteenth Amendment. Correctly viewed, § 5 is a positive grant of legislative power authorizing Congress to exercise its discretion in determining whether and what legislation is needed to secure the guarantees of the Fourteenth Amendment.

*Katzenbach,* 384 U.S. at 651, 86 S.Ct. at 1723–24;[3] *see also, City of Richmond v. J.A. Croson Co.,* 488 U.S. 469, 490, 109 S.Ct. 706, 720, 102 L.Ed.2d 854 (1989) (O'Connor, J.) ("The power to 'enforce' [the provisions of the Fourteenth Amendment] may at times also include the power to define situations which Congress determines threaten principles of equality and to adopt prophylactic rules to deal with those situations."); Archibald Cox, *Foreword: Constitutional Adjudication and the Promotion of Human Rights,*

---

3. In *McCulloch v. Maryland,* 17 U.S. (4 Wheat.) 316,. 4 L.Ed. 579 (1819), the Court defined the scope of Congressional power under the Necessary and Proper Clause, U.S. CONST. art. I, § 8, cl. 18. Writing for the Court, Chief Justice Marshall established the classic formulation for the reach of Congressional power:

> Let the end be legitimate, let it be within the scope of the constitution, and all means which are appropriate, which are plainly adapted to that end, which are not prohibited, but consistent with the letter and spirit of the constitution, are constitutional.

*McCulloch,* 17 U.S. (4 Wheat.) at 421.

80 HARV.L.REV. 91, 107 (1966). Based on this language, lower courts have noted:

> In exercising these enforcement powers under § 5, Congress is not limited to remedying inequalities which the courts would determine to be violative of the Constitution. It may prohibit conduct which would not otherwise by unlawful, in order to secure the guarantees of the Fourteenth Amendment[, and] ... great deference is to be accorded to Congress' determination of what measures are appropriate to that end.

*Bond v. Stanton,* 555 F.2d 172, 174–75 (7th Cir.1977), *cert. denied,* 438 U.S. 916, 98 S.Ct. 3146, 57 L.Ed.2d 1161 (1978); *see also, Flores v. City of Boerne, Tex.,* 73 F.3d 1352, 1357 (5th Cir.1996); *Corpus v. Estelle,* 605 F.2d 175, 179–80 (5th Cir.1979), *cert. denied,* 445 U.S. 919, 100 S.Ct. 1284, 63 L.Ed.2d 605 (1980).

Further, "Congress's [sic] power under section 5 of the fourteenth amendment clearly extends to protection of any group of persons invidiously discriminated against by state law." *United States v. Uvalde Consol. Indep. Sch. Dist.,* 625 F.2d 547, 553 (5th Cir.1980). Thus, courts have upheld legislation against a number of forms of discrimination under section 5 of the Fourteenth Amendment. *E.g., Flores v. City of Boerne, Tex.,* 73 F.3d 1352 (5th Cir.1996) (Religious Freedom Restoration Act); *Fontenot v. Louisiana Bd. of Elementary & Secondary Educ.,* 835 F.2d 117 (5th Cir.1988) (attorney fees under the Education of the Handicapped Act); *Ramirez v. Puerto Rico Fire Serv.,* 715 F.2d 694 (1st Cir.1983) (Age Discrimination in Employment Act); *American Fed. of State, County & Mun. Employees v. Washington,* 578 F.Supp. 846 (W.D.Wash.1983) (gender discrimination in employment), *rev'd on other grounds,* 770 F.2d 1401 (9th Cir. 1985).

The Rehabilitation Act of 1973 was enacted to, among other things, "empower individuals with disabilities to maximize employment, economic self-sufficiency, independence, and inclusion and integration into society, through ... the guaranty of equal opportunity." 29 U.S.C. § 701(b)(1)(F). The act was enacted based in part on Congress' finding that

> individuals with disabilities continually encounter various forms of discrimination in such critical areas as employment, housing, public accommodations, education, transportation, communication, recreation, institutionalization, health services, voting, and public services.

29 U.S.C. § 701(a)(5). Similarly, the ADA was enacted "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1). As these provisions make clear,

> [t]he Rehabilitation Act and the ADA were enacted to prevent old-fashioned and unfounded prejudices against disabled persons from interfering with those individuals' rights to enjoy the same privileges and duties afforded to all United States citizens.

*Galloway v. Superior Ct. of Dist. of Columbia,* 816 F.Supp. 12, 20 (D.D.C.1993). Both acts have the purpose of furthering "the traditional Equal Protection goal of protecting a discrete class of individuals from arbitrary and capricious actions...." *United States Equal Employment Opportunity Comm'n v. Calumet County,* 686 F.2d 1249, 1252 (7th Cir.1982). Accordingly, both acts were valid exercises of Congress' power to "enforce, by appropriate legislation," the Fourteenth Amendment's guaranty to each citizen of the equal protection of the laws.

### 3. Conclusion

▮ Because both the Rehabilitation Act of 1973 and the ADA are proper exercises of Congress' power to enforce the provisions of the Fourteenth Amendment, and because in both acts Congress has indicated in clear, unequivocal language its intent to abrogate states' Eleventh Amendment immunity, the Court should conclude that the Eleventh Amendment does not bar the plaintiffs' suit.

## III. APPLICATION OF SECTION 504 AND THE ADA TO STATE PRISONS [4]

Defendants' alternative grounds for dismissing plaintiffs' section 504 and ADA claims is that neither statute applies to state prisons. After considering each statute separately, the Court should conclude that they both apply to state prisons, for the reasons that follow.[5]

### A. Principles of Statutory Construction

"In determining the meaning of [a] statute, we look not only to the particular statutory language, but to the design of the statute as a whole and to its object and policy." *Crandon v. United States*, 494 U.S. 152, 158, 110 S.Ct. 997, 1001, 108 L.Ed.2d 132 (1990); *see also, Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 51, 107 S.Ct. 1549, 1554–55, 95 L.Ed.2d 39 (1987) (quoting *United States v. Heirs of Boisdore*, 49 U.S. (8 How.) 113, 122, 12 L.Ed. 1009 (1849)). It is a "familiar canon of statutory construction that remedial legislation should be construed broadly to effectuate its purposes." *Tcherepnin v. Knight*, 389 U.S. 332, 336, 88 S.Ct. 548, 553, 19 L.Ed.2d 564 (1967) (broadly construing the Securities Exchange Act of 1934); *see, e.g., Atchison, T. & S.F. Ry. v. Buell*, 480 U.S. 557, 562, 107 S.Ct. 1410, 1413–14, 94 L.Ed.2d 563 (1987) (Federal Employer Liability Act); *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 497–98, 105 S.Ct. 3275, 3285–86, 87 L.Ed.2d 346 (1985) (Racketeer Influenced Corrupt Organizations Act); *Jefferson County Pharmaceutical Ass'n, Inc. v. Abbott Labs.*, 460 U.S. 150, 158–59, 103 S.Ct. 1011, 1017–18, 74 L.Ed.2d 882 (1983) (Robinson–Patman Anti–Price Discrimination Act); *Peyton v. Rowe*, 391 U.S. 54, 64–65, 88 S.Ct. 1549, 1554–55, 20 L.Ed.2d 426 (1968) (habeas corpus relief under 28 U.S.C. § 2241); *Securities and Exchange Comm'n v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 185–86, 84 S.Ct. 275, 279–80, 11 L.Ed.2d 237 (1963) (Investment Advisors Act of 1940). This broad construction is also applied to civil rights statutes. *Accord City of Memphis v. Greene*, 451 U.S. 100, 120, 101 S.Ct. 1584, 1596–97, 67 L.Ed.2d 769 (1981) (42 U.S.C. § 1982); *Owen v. City of Independence, Mo.*, 445 U.S. 622, 635–36, 100 S.Ct. 1398, 1407–08, 63 L.Ed.2d 673 (1980) (42 U.S.C. § 1983). Accordingly, a broad construction is given to both the Rehabilitation Act, *Moreno v. Consolidated Rail Corp.*, 63 F.3d 1404, 1415 (6th Cir.1995), and to the ADA, *Civic Ass'n of the Deaf of New York City, Inc. v. Giuliani*, 915 F.Supp. 622, 634 (S.D.N.Y.1996); *Tyler v. City of Manhattan*, 849 F.Supp. 1429, 1441 (D.Kan.1994); *Kinney v. Yerusalim*, 812 F.Supp. 547 (E.D.Pa.), *aff'd*, 9 F.3d 1067 (3d Cir.1993), *cert. de-*

---

**4.** Plaintiffs argue that the Court need not decide this issue here because it has already decided the issue in its acceptance of my previous Report & Recommendation. They argue that defendants raised this argument in their objections to that Report, and that Judge Borman's Order accepting that report rejected all of defendants' objections. In addition, they argue, because the Court resolved the substantive issues raised by defendants' first motion to dismiss in their favor, the Court implicitly concluded that the ADA and Rehabilitation Act do apply to state prisons. Thus, they contend, defendants' argument on this issue is barred by the "law of the case" doctrine, which "precludes a court from re-examining an issue previously decided by itself or a higher court." *Johns–Manville Corp. v. Guardian Indus. Corp.*, 116 F.R.D. 97, 101 (E.D.Mich.1987). This doctrine applies whether the issue was decided "explicitly or by necessary inference from the disposition." *Coal Resources, Inc. v. Gulf & Western Indus., Inc.*, 865 F.2d 761, 766 (6th Cir.1989) (internal quotation omitted).

While I agree with plaintiffs that my earlier Report & Recommendation and Judge Borman's Order accepting that Report necessarily resolved this issue by implication, I nonetheless discuss the merits of defendants' argument. This is appropriate because: (1) it leads to the same conclusion as application of the law of the case doctrine; and (2) specifically with respect to the ADA, the law on this issue is largely undeveloped, necessitating that the Court make its reasoning on this issue clear and explicit. However, to the extent that defendants raise issues explicitly addressed in my previous Report, such as Hendrick's standing to sue under the ADA or Niece's eligibility to receive a "service" under the ADA, the law of the case doctrine applies and such issues are not reconsidered here.

**5.** With respect to plaintiffs' ADA claims, the following discussion focuses primarily on the claims under Title II, 42 U.S.C. § 12132. Plaintiffs' retaliation claims under 42 U.S.C. § 12203 clearly prohibit prison officials from discriminating against an individual in retaliation for her participation in an investigation under the ADA. The plain language applies to any person, and there is no legitimate penological interest served by allowing such retaliation.

*nied,* —— U.S. ——, 114 S.Ct. 1545, 128 L.Ed.2d 196 (1994).

## B. *The Plain Meaning of Section 504 and the ADA*

By its terms, section 504 applies to *"any* program receiving Federal financial assistance." 29 U.S.C. § 794 (emphasis added). Similarly, title II of the ADA applies to *"any* [public] entity," 42 U.S.C. § 12132 (emphasis added), which is further defined to include *"any* department, agency, special purpose district, or other instrumentality of a State or States or local government." 42 U.S.C. § 12131(1)(B) (emphasis added).

 In construing a statute, especially a remedial one which must be construed broadly to effectuate its purpose, " '[t]he word "any" is generally used in the sense of "all" or "every" and its meaning is most comprehensive.' " *Fleck v. KDI Sylvan Pools, Inc.,* 981 F.2d 107, 115 (3d Cir.1992) (quoting *McCormick v. Columbus Conveyer Co.,* 522 Pa. 520, 564 A.2d 907, 910 (1989)) (construing Pennsylvania statute of repose); *see also, United States v. Rosenwasser,* 323 U.S. 360, 362–63, 65 S.Ct. 295, 296–97, 89 L.Ed. 301 (1945) ("any" employee as used in Fair Labor Standards Act includes all employees unless specifically excluded). Defendants do not dispute that the Michigan Department of Corrections is a program receiving federal assistance. Because it is *a* program receiving federal assistance, it is one of *any* such programs covered by section 504. Likewise it is clear, and defendants do not dispute, that MDOC is a department of the State of Michigan. *See, e.g., Hutsell v. Sayre,* 5 F.3d 996, 999 (6th Cir.1993). Because MDOC is a department of the State of Michigan, it clearly comes under the definition of "public enti-ty" in 42 U.S.C. § 12131 and is therefore subject to Title II of the ADA. In addition, plaintiffs state claims of retaliation against defendants, pursuant to 42 U.S.C. § 12203. By its clear terms this statutory provision applies to any person who discriminates against an individual in retaliation for attempting to enforce rights under the ADA.[6]

## C. *The Department of Justice Regulations Implementing Section 504 and the ADA*

The regulations promulgated by the Department of Justice implementing both section 504 and Title II of the ADA make it clear that they both apply to state prisons. Section 504 applies to "any program receiving Federal financial assistance." 29 U.S.C. § 794. The regulations interpreting this provision define program as "the operations of the agency or organizational unit of government receiving or substantially benefiting from the Federal assistance awarded, e.g., a ... *department of corrections."* 28 C.F.R. § 42.540(h) (1995) (emphasis added). Similarly, the regulations promulgated under the ADA charge the Department of Justice to enforce compliance in "[a]ll programs, services, and regulatory activities relating to law enforcement, public safety, and the administration of justice, including courts and *correctional institutions."* 28 C.F.R. § 35.190(b)(6) (1995) (emphasis added); *see also* 28 C.F.R. Part 35, Appendix A, at 460–61 (1995) (explaining that under 28 C.F.R. § 35.130(b)(8), a public entity need not provide attendant care or similar assistance "except in special circumstances, such as where the individual is an inmate of a custodial or correctional institution.").[7]

 "[C]onsiderable weight should be accorded to an executive department's con-

---

6. In addition, Congress provided that

 nothing in [the ADA] shall be construed to apply a lesser standard that the standards applied under title V of the Rehabilitation Act of 1973 (29 U.S.C. 790 et seq.) or the regulations issued by Federal agencies. pursuant to such title.

 42 U.S.C. § 12201(a). As discussed below, the case law and regulations under the ADA at the time of its enactment held the Rehabilitation·Act applicable to state prisons. Because it is assumed that Congress is knowledgeable of the existing law when it enacts legislation, *Miles v.*

*Apex Marine Corp.,* 498 U.S. 19, 32, 111 S.Ct. 317, 325–26, 112 L.Ed.2d 275 (1990), the Court should assume that Congress intended that the ADA apply to prisons.

7. In addition, the regulations and case law applicable to interpreting section 504 are applicable in determining the contours of the ADA. *See, Patton v. TIC United Corp.,* 77 F.3d 1235, 1245 (10th Cir.1996); *Helen L. v. DiDario,* 46 F.3d 325, 330 n. 7 (3d Cir.), *cert. denied,* —— U.S. ——, 116 S.Ct. 64, 133 L.Ed.2d 26 (1995).

struction of a statutory scheme it is entrusted to administer." *Chevron, U.S.A., Inc. v. Natural Resources Defense Council,* 467 U.S. 837, 844, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984). In fact, such regulations are entitled to "controlling weight" unless they are "arbitrary, capricious or manifestly contrary to the statute." *Id.* at 844, 104 S.Ct. at 2782. As the Supreme Court has noted, the regulations implementing the Rehabilitation Act provide "an important source of guidance on the meaning of § 504." *Alexander v. Choate,* 469 U.S. 287, 304 n. 24, 105 S.Ct. 712, 722 n. 24, 83 L.Ed.2d 661 (1985); *see also, School Bd. of Nassau County v. Arline,* 480 U.S. 273, 279, 107 S.Ct. 1123, 1126–27, 94 L.Ed.2d 307 (1987). The same is true of the regulations promulgated under the ADA: "Because Title II was enacted with broad language and directed to the Department of Justice to promulgate regulations [thereunder], the regulations which the Department promulgated are entitled to substantial deference." *Helen L. v. DiDario,* 46 F.3d 325, 331 (3d Cir.) (citing *Blum v. Bacon,* 457 U.S. 132, 141, 102 S.Ct. 2355, 2361, 72 L.Ed.2d 728 (1982)), *cert. denied,* —— U.S. ——, 116 S.Ct. 64, 133 L.Ed.2d 26 (1995). Accordingly, the Court should conclude that section 504 and the ADA apply to state prisons.

D. *The Case Law Applying Section 504 and the ADA*

1. *Case Law Under Section 504*

■ A long line of cases applies section 504 to state prisons. Thus, it is clear that "the Rehabilitation Act applies with the same force and effect in corrections institutions as it does in other federally funded programs." *Austin v. Pennsylvania Dep't of Corrections,* 876 F.Supp. 1437, 1465 n. 17 (E.D.Pa.1995); *accord Lue v. Moore,* 43 F.3d 1203, 1205 (8th Cir.1994); *Harris v. Thigpen,* 941 F.2d 1495, 1522 n. 41 (11th Cir.1991); *Bonner v. Lewis,* 857 F.2d 559, 562 (9th Cir.1988); *Journey v. Vitek,* 685 F.2d 239, 242 (8th Cir.1982); *Sites v. McKenzie,* 423 F.Supp. 1190, 1197 (N.D.W.Va.1976).

Contrary to defendants' assertion, *Gates v. Rowland,* 39 F.3d 1439 (9th Cir.1994) does not limit the *Bonner* decision. In *Gates,* the Ninth Circuit specifically reaffirmed its *Bon-* ner holding that the Rehabilitation "Act is applicable to prisons receiving federal financial assistance." *Gates,* 39 F.3d at 1446. The question in *Gates* was not *whether* the Rehabilitation Act applied, but *how* it applied. Thus, it did not limit *Bonner* at all.

Nor is *Williams v. Meese,* 926 F.2d 994 (10th Cir.1991), persuasive. In *Williams,* the court held that section 504 does not apply to *federal* prisoners "since the Federal Bureau of Prisons does not fit the definition of 'programs or activities' governed by this section." *Williams,* 926 F.2d at 997. However, the court merely made this blanket assertion without discussion of the relevant statutory language, history of the Act, or regulations promulgated thereunder; nor did the court discuss the reasoning behind its conclusion. For this reason, *Williams* is not persuasive. Thus, the case law strongly favors application of section 504 to state prisons.

2. *Case Law Under the ADA*

A number of courts have held, either explicitly or implicitly, that the ADA applies to state prisons and that state prisoners may bring suit under the ADA. *Clarkson v. Coughlin,* 898 F.Supp. 1019, 1035–37 (S.D.N.Y.1995) (reasoning that section 504 applies to prisons and recognizing similarity between section 504 and ADA); *Love v. McBride,* 896 F.Supp. 808 (N.D.Ind.1995) (allowing inmate's suit under ADA although not explicitly addressing the issue); *Rewolinski v. Morgan,* 896 F.Supp. 879, 881 (E.D.Wis. 1995) (same); *Noland v. Wheatley,* 835 F.Supp. 476, 483 (N.D.Ind.1993) (same); *Outlaw v. City of Dothan, Ala.,* No. CV 92–A–1219–S, 1993 WL 735802, at *4 (M.D.Ala. Apr. 27, 1993) ("The court holds that the Americans with Disabilities Act required the City of Dothan to make the shower in its jail readily accessible to and usable by the plaintiff."). Nonetheless, there are several cases, cited by defendants, holding that the ADA is not applicable to state prisons. Because the cases cited by defendants are either distinguishable or unpersuasively reasoned, the Court should conclude that the ADA is applicable to state prisons.

The case principally relied on by defendants is *Torcasio v. Murray*, 57 F.3d 1340 (4th Cir.1995). *Torcasio* did not decide the question now under consideration. Rather, the court held only that the prison official defendants in that case were entitled to qualified immunity from plaintiff's ADA and section 504 claims because, at the time of the defendants' actions, "it was not then clearly established that either statute applied to state prisons," thus entitling defendants to qualified immunity. *Torcasio*, 57 F.3d at 1352. Thus, any discussion of whether the ADA applies to prison settings at all is, at best, *dicta*. Even this *dicta*, however, is unpersuasive.

The *Torcasio* court stated that, because of the compelling state interest involved in maintaining its own prisons, "Congress must speak unequivocally before we will conclude that it has 'clearly' subjected state prisons to its enactments." *Id.* at 1346. However, no such rule of statutory construction seems to support this proposition. Indeed, the long line of prisoner civil rights cases filed under 42 U.S.C. § 1983 would seem to belie this reasoning. Section 1983 does not, by its explicit terms, "clearly" state that prison officials are subject to an action under the statute. Yet, it cannot be doubted that prisoners are protected by and may file suit under § 1983. *McCollum v. Mayfield*, 130 F.Supp. 112, 116 (N.D.Cal.1955) ("an imprisoned felon . . . is empowered to sue in the federal courts under this section."); *Siegel v. Ragen*, 88 F.Supp. 996, 998 (N.D.Ill.1949) ("The fact that plaintiffs are incarcerated in a penitentiary under convictions for felonies, does not deprive them of the right to invoke the provisions of the Civil Rights Act."), *aff'd*, 180 F.2d 785 (7th Cir.), *cert. denied*, 339 U.S. 990, 70 S.Ct. 1015, 94 L.Ed. 1391 (1950); *Gordon v. Garrson*, 77 F.Supp. 477, 479 (E.D.Ill. 1948). Similarly, the Religious Freedom Restoration Act (RFRA), 42 U.S.C. § 2000bb–1, does not explicitly state that it proscribes the conduct of state prison officials or that state prisoners are protected by it. Yet, since its adoption, courts have routinely applied the RFRA to prisoner claims.

*E.g., Werner v. McCotter*, 49 F.3d 1476, 1479 (10th Cir.1995); *Bryant v. Gomez*, 46 F.3d 948, 948 (9th Cir.1995) (per curiam); *Brown–El v. Harris*, 26 F.3d 68, 69 (8th Cir.1994); *Muslim v. Frame*, 891 F.Supp. 226, 229 (E.D.Pa.1995); *Woods v. Evatt*, 876 F.Supp. 756, 761 (D.S.C.1995); *Campos v. Coughlin*, 854 F.Supp. 194 (S.D.N.Y.1994). As the application of these statutes shows, there is simply no support for the *Torcasio* court's conclusion that state prisons must have been "clearly" subjected to the provisions of the ADA.

In a similar vein, the *Torcasio* court also relied on the Supreme Court's language in *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989), which states: "If Congress intends to alter the 'usual constitutional balance between the States and the Federal Government,' it must make its intention to do so 'unmistakably clear in the language of the statute.'" *Id.* at 65, 109 S.Ct. at 2309 (quoting *Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 242, 105 S.Ct. 3142, 3147, 87 L.Ed.2d 171 (1985)); *see Torcasio*, 57 F.3d at 1344. Contrary to the conclusion of the *Torcasio* court, however, Congress did make it "unmistakably clear" that it was altering the balance between the states and the federal government. By its very terms, Title II of the ADA proscribes the conduct of a state government and its department and agencies. 42 U.S.C. § 12131, 12132. Further, as discussed above, Congress clearly abrogated the states' Eleventh Amendment immunity. 42 U.S.C. § 12202. These statutory provisions make "clear and manifest" Congress' intention "to pre-empt the historic powers of the States" by enactment of the ADA. *Will*, 491 U.S. at 65, 109 S.Ct. at 2309 (citing *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947)). Thus, the ADA satisfies the *Will* requirements. In short, the reasoning of the *Torcasio* court is unpersuasive in light of the plain language, legislative history, the regulations promulgated thereunder, and the policies sought to be advanced by the ADA.[8]

---

8. Defendants also rely on *Staples v. Virginia Dep't of Corrections*, 904 F.Supp. 487 (E.D.Va. 1995) and *Little v. Lycoming County*, 912 F.Supp.

809 (M.D.Pa.1996). However, because these cases simply rely on the *Torcasio* reasoning, they

Defendants also rely on *Pierce v. King,* 918 F.Supp. 932 (E.D.N.C.1996). This case is likewise distinguishable. Pierce dealt with the application of the ADA to prison employment. Unlike visitation rights or telephone access, prison employment does not constitute the provision of a "service" under the meaning of Title II of the ADA. Rather, discrimination in employment comes within the ambit of Title I. Whether an inmate qualifies as an employee under the meaning of Title I is doubtful. *See, e.g., Harker v. State Use Indus.,* 990 F.2d 131, 133 (4th Cir.) (state prisoners not entitled to minimum wage under Fair Labor Standards Act because they are not within the meaning of the word "employee" as used in the Act), *cert. denied,* 510 U.S. 886, 114 S.Ct. 238, 126 L.Ed.2d 192 (1993); *Vanskike v. Peters,* 974 F.2d 806, 808 (7th Cir.1992) (same); *but cf. Carter v. Dutchess Community College,* 735 F.2d 8, 12 (2d Cir.1984) (adopting "economic reality" test, which in theory could permit a prisoner to qualify as an employee). However, this question is quite different from the questions presented here: whether state prison officials can deny services to qualified individuals on the basis of a disability, and whether state prison officials can retaliate against persons seeking to enforce their rights under the ADA. Thus, *Pierce* has little, if anything, to contribute to the resolution of this case.

Also troubling is the *Pierce* court's rejection of the Fourteenth Amendment basis for this legislation. The court stated:

Although framed in terms of addressing discrimination, the Act's operative remedial provisions demand not equal treatment, but special treatment tailored to the claimed disability. In this respect, the ADA differs radically from traditional anti-discrimination laws, such as Title VII, which seek only a state of affairs where individuals are treated in a neutral manner without regard to race, sex, age, etc. Unlike anti-discrimination laws, the ADA *demands* entitlement in order to achieve its goals. This the Fourteenth Amendment does not authorize.

*Pierce,* 918 F.Supp. at 940 (emphasis in original). Yet, this approach was rejected by the Supreme Court in *Alexander v. Choate,* 469 U.S. 287, 105 S.Ct. 712, 83 L.Ed.2d 661 (1985), in which the Court noted:

Our use of the term "affirmative action" in this context has been severely criticized for failing to appreciate the difference between affirmative action and reasonable accommodation; the former is said to refer to a remedial policy for the victims of past discrimination, while the latter relates to the elimination of existing obstacles against the handicapped. Regardless of the aptness of our choice of words in [*Southeastern Community College v.*] *Davis*[, 442 U.S. 397, 99 S.Ct. 2361, 60 L.Ed.2d 980 (1979) ], it is clear from the context of *Davis* that the term "affirmative action" referred to those "changes," "adjustments," or "modifications" to existing programs that would be "substantial," 442 U.S. at 410, 411, n. 10, 413, [99 S.Ct. at 2369, 2369 n. 10, 2370-71] or that would constitute "fundamental alteration[s] in the nature of a program ...," *id.,* at 410, [99 S.Ct. at 2369], rather than those changes that would be reasonable accommodations.

*Alexander,* 469 U.S. at 300-01 n. 20, 105 S.Ct. at 720 n. 20 (citations omitted). Thus, in *Alexander* "the Court clarified that reasonable accommodation was a nondiscrimination, not an affirmative action, obligation...." Robert L. Burgdorf, Jr., *The Americans with Disabilities Act: Analysis and Implications of a Second–Generation Civil Rights Statute,* 26 HARV.C.R.-C.L.L.REV. 413, 431 n. 96 (1991). Accordingly, the *Pierce* court's Fourteenth Amendment concerns are unfounded.

### E. *Policy Considerations*

Of course, the above discussion is not intended to diminish the conflicting policy considerations at issue. On the one hand, Congress clearly sought to "provide a clear and comprehensive mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1). This was based on Congress' finding that "individuals with disabilities are a discrete and insu-

are unpersuasive. *See Staples,* 904 F.Supp. at 490; *Little,* 912 F.Supp. at 818–19.

lar minority who have been faced with restrictions and limitations [and] subjected to a purposeful history of unequal treatment," *id.* § 12101(a)(7), but who, "unlike individuals who have experienced discrimination on the basis of race, color, sex, national origin, religion, or age, ... have often had no legal recourse to redress such discrimination." *Id.* § 12101(a)(4). President Bush described the ADA as "the world's first comprehensive declaration of equality for people with disabilities." President George Bush, Remarks by the President During Ceremony for the Signing of the Americans with Disabilities Act of 1990, 2 (July 26, 1990), *quoted in* Robert L. Burgdorf, Jr., *The Americans with Disabilities Act: Analysis and Implications of a Second–Generation Civil Rights Statute*, 26 HARV.C.R.–C.L.L.REV. 413, 413–14. The ADA is the culmination of a long, arduous struggle on the part of persons with disabilities to attain equal treatment through the civil rights laws. *See generally, Heather K. by Anita K. v. City of Mallard, Iowa,* 887 F.Supp. 1249, 1263–66 (N.D.Iowa 1995); Burgdorf, *supra,* at 413–34; Jones, *Overview and Essential Requirements of the Americans with Disabilities Act,* 64 TEMP.L.REV. 471, 472–75 (1991).

Balanced against these policy concerns are the states' strong interests in the maintenance of state penal institutions, an interest traditionally accorded strong deference by federal courts. *See, e.g., Turner v. Safley,* 482 U.S. 78, 89, 107 S.Ct. 2254, 2261, 96 L.Ed.2d 64 (1987) ("[W]hen a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests."); *Procunier v. Martinez,* 416 U.S. 396, 412, 94 S.Ct. 1800, 1810–11, 40 L.Ed.2d 224 (1974); *Preiser v. Rodriguez,* 411 U.S. 475, 491–92, 93 S.Ct. 1827, 1837–38, 36 L.Ed.2d 439 (1973); *Price v. Johnston,* 334 U.S. 266, 285, 68 S.Ct. 1049, 1060, 92 L.Ed. 1356 (1948) ("Lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights."). Relying on this line of Supreme Court precedent, the *Torcasio* court stated:

There can be little doubt that application of the ADA and Rehabilitation Act would have serious implications for the management of state prisons, in matters ranging from cell construction and modification, to inmate assignment, to scheduling, to security procedures.

*Torcasio,* 57 F.3d at 1346.

However, application of the Rehabilitation Act and the ADA to state prisons would not bring about the horrors portended by the *Torcasio* court. Under both the ADA and section 504, an individual is qualified to receive the protections of the statute only if he or she meets the eligibility requirements for the particular service or program in question either as the program exists, or as it would exist with *"reasonable* modification." 42 U.S.C. § 12131(2); *see* 29 U.S.C. § 794.[9] By its very definition, "reasonable" would take into account the nature of the modification sought and the circumstances in which the modification is sought. *See, e.g.,* BLACK'S LAW DICTIONARY 1265 (6th ed. 1990) (defining reasonable as "fair, proper, just, moderate, *suitable under the circumstances* ) (emphasis added). Thus, for example, a modification which would seriously jeopardize the security of other inmates or of prison officials would not be "suitable under the circumstances," and would therefore not by "reasonable."

Particularly persuasive is the Sixth Circuit's recent decision in *Sandison v. Michigan High School Athletic Ass'n,* 64 F.3d 1026 (6th Cir.1995). In *Sandison,* the court considered whether the Michigan High School Athletic Association's (MHSAA) age-eligibility rule violated section 504 and Title II of the ADA as applied to a student who, because of a learning disability, was two grades behind his age group. The MHSAA rule in question prohibited any person who was 19 years old on or before September 1 of the school year in question from participating in high school athletics. Plaintiff filed suit under, among other statutes, section 504 and Title II of the ADA. *Id.* at 1028–29.

---

**9.** Although the language of section 504 itself does not explicitly provide that a person is a "qualified individual" under the section if reasonable accommodation can be made, it has been interpreted thusly. *See, e.g.,* 857 F.2d 1073 (6th Cir. 1988).

The court found that the age restriction is "a necessary requirement of the interscholastic sports program" because it safeguards other, younger competitors from injury and prevents unfair competitive advantage to older participants. *Id.* at 1035. The court further reasoned that lifting the age restriction would not be a "reasonable accommodation" as required under section 504:

> Aside from the necessity of the program's requirement, the other question in the otherwise qualified inquiry is " 'whether some "reasonable accommodation" is available *to satisfy the legitimate interests of both the grantee and the handicapped person.* And since it is part of the "otherwise qualified" inquiry, our precedent requires that the "reasonable accommodation" question be decided as an issue of fact.' "

*Id.* at 1034 (quoting *Doherty v. Southern College of Optometry*, 862 F.2d 570, 575 (6th Cir.1988) (quoting *Brennan v. Stewart*, 834 F.2d 1248, 1261–62 (5th Cir.1988)), *cert. denied*, 493 U.S. 810, 110 S.Ct. 53, 107 L.Ed.2d 22 (1989)) (emphasis added). The court then noted that "[g]enerally, an '[a]ccommodation is not reasonable if it either imposes undue financial and administrative burdens on a grantee, or requires a fundamental alteration in the nature of [the] program.' " *Id.* at 1034 (quoting *Arline*, 480 U.S. at 287 n. 17, 107 S.Ct. at 1131 n. 17 (citations omitted) (internal quotation omitted)). Applying these rules, the court found that the only possible accommodation would be to lift the age restriction, and such an accommodation would fundamentally alter the sports program. *Id.* at 1034–35. Accordingly, the age restriction did not violate section 504. *Id.* at 1035. With respect to the plaintiff's claim under Title II of the ADA, the court found that the same analysis applies to the "reasonable modification" language of 42 U.S.C. § 12131(2), "add[ing] only that the word 'modification' 'connotes moderate change.' " *Id.* at 1037 (quoting *MCI Telecommunications Corp. v. AT & T Co.*, 512 U.S. 218, ——, 114 S.Ct. 2223, 2230, 129 L.Ed.2d 182 (1994)).

As *Sandison* clearly illustrates, accommodations or modifications under section 504 and Title II of the ADA must be reasonable, and "reasonable" depends upon the nature of the service or program and the type of modification in question. The policy concerns inherent in the maintenance of state correctional facilities, such as security, discipline, and rehabilitation, will not be frustrated by application of either section 504 or the ADA to state prisons. *Cf., Gates*, 39 F.3d at 1447 (indicating that under the ADA, as under the Constitution a regulation " 'is valid if it is reasonably related to legitimate penological interests.' ") (quoting *Turner*, 482 U.S. at 89, 107 S.Ct. at 2261–62). Accordingly, a consideration of the policy interests involved weighs in favor of applying section 504 and the ADA to state prisons.

## IV. CONCLUSION

In light of the foregoing, the Court should conclude that Congress has properly abrogated the states' Eleventh Amendment immunity, and thus plaintiffs' claim is not barred by that Amendment. Further, the Court should conclude that the provisions of Title II and Title IV are applicable to state prisons. Accordingly, because plaintiffs' have stated a claim upon which relief may be granted, the Court should deny defendants' motion to dismiss.

## NOTICE TO PARTIES REGARDING OBJECTIONS

 The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. section 636(b)(1) and E.D.Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Howard v. Secretary of Health & Human Services*, 932 F.2d 505 (6th Cir.1991). Filing of objections which raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. *Smith v. Detroit Federation of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir.1987); *Willis v. Sullivan*, 931 F.2d 390, 401 (6th Cir.1991). Pur-

suant to E.D.Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than five (5) pages in length unless by motion and order such page limit is extended by the Court. The response shall address specifically, and in the same order raised, each issue contained within the objections.

Dated: June 27, 1996.